IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RITA F. HARMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-07-225-R |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her concurrent applications for disability insurance and

supplemental security income benefits under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1382.   Defendant has answered the Complaint and filed the

administrative record (hereinafter TR___), and the parties have briefed the issues.   The matter

has been referred to the undersigned Magistrate Judge for initial proceedings consistent with

28 U.S.C. § 636(b)(1)(B).    For the following reasons, it is recommended that the

Commissioner's decision be affirmed.

I. Background

In Plaintiff's applications filed with the agency on January 5, 2004 (protective filing

date December 10, 2003), Plaintiff alleged that she became disabled on November 4, 2003,

due to primary biliary cirrhosis, neck degeneration, and Meniere's disease. (TR 74-76, 105,

1

113, 400-402). Plaintiff stated that she had completed one year of college and vocational training as a surgical assistant, she had previously worked as a hospital switchboard operator and data entry worker, and she stopped working on November 4, 2003, when she was terminated for "los[ing] composure" and "due to illness and stress." (TR 105-106, 111). Plaintiff described her daily activities (TR 85-90) and her past relevant work (TR 91-94). Her employment records indicate she worked as a data entry operator for a trucking company and a car rental company in 1985-1986 and 1991-1993 and that she worked as a hospital switchboard operator from February 1996 to November 2003. (TR 99).

Plaintiff's applications were administratively denied. (TR 57, 58, 403, 407). At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge Kallsnick ("ALJ") on November 4, 2005, at which Plaintiff and a vocational expert ("VE") testified. (TR 419-445). The ALJ subsequently issued a decision in which the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because she had the residual functional capacity ("RFC") to perform her previous jobs. (TR 14-20). The Appeals Council rejected Plaintiff's request to review the decision. (TR 7-9). Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

## II. Standard of Review

The Court's review of the Commissioner's decision is limited, and the Commissioner's decision will be upheld if it is supported by substantial evidence in the record and the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991).

2

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). In reviewing the Commissioner's decision, the Court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). However, the Court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the record fairly detracts from its weight." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f) (2007); see also Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005)(describing five steps in detail). In this case, the ALJ determined at the fourth step of the requisite sequential evaluation process that Plaintiff retains the capacity to

3

perform her previous work.

III. Claims and Responses

Plaintiff contends that the ALJ erred by failing to find that she had severe impairments due to cervical spine arthritis, Meniere's disease, depression, and carpal tunnel syndrome. With respect to the ALJ's evaluation of the credibility of Plaintiff's subjective testimony, Plaintiff contends that the ALJ was biased against her and that the ALJ erred by "resorting to boilerplate" reasons justifying his credibility determination. Plaintiff further contends that the ALJ ignored relevant medical evidence in the record with respect to the credibility analysis and with respect to the RFC finding.

IV. Medical Record

Plaintiff's medical record shows that Plaintiff was diagnosed with chronic hepatitis C virus in March 2001, and she underwent a liver biopsy in 2001 which showed grade 1, stage 1 liver disease. (TR 149, 282-283).   In June 2001, Plaintiff was evaluated by a gastroenterologist, Dr. Morris, who recommended that Plaintiff undergo further testing to determine the duration of treatment for the virus. (TR 282).  Dr. Morris also indicated Plaintiff had gastroesophageal reflux disease ("GERD") which was under control on medication and that she was taking anti-depressant medication for a remote history of depression. (TR 282). Dr. Morris advised Plaintiff's family physician, Dr. Hubbard, in a letter dated June 22, 2001, that Plaintiff's chronic hepatitis C virus was genotype 1a and that she was ready to begin 48 weeks of treatment with medication therapy for the virus. (TR 281).  He noted Plaintiff exhibited no symptoms of chronic liver disease. (TR 281).   In January 2003, Plaintiff was

evaluated by Dr. Bader for possible participation in a study for hepatitis C viral re-treatment.

Dr. Bader examined Plaintiff and reported Plaintiff was not a candidate for the study because

she responded well to her previous hepatitis C therapy in 2001.  (TR 149-151).  Plaintiff,

however, was prescribed interferon medication for chronic hepatitis C infection and

medication for heartburn.  (TR 151).  Dr. Bader noted Plaintiff's lab testing suggested the

possibility she had co-existing primary biliary cirrhosis but this possible condition would only

be evaluated after eliminating her hepatitis C viral infection. (TR 151-152).  Plaintiff

continued the interferon treatment under the care of Dr. Morrist. (TR 276).  In October 2003,

Dr. Morris's clinic reported Plaintiff gave a history of depression "under good control" with

anti-depressant medication, a history of GERD treated with medication, and a history of

chronic hepatitis C infection. (TR 276).  Plaintiff stated her appetite was good, her weight was

stable, and she denied nausea or vomiting. (TR 276).  A physical examination was conducted,

and the clinic reported Plaintiff exhibited no abnormalities, including full range of motion of

her upper and lower extremities and no neurological deficits. (TR 277).

A computed tomographic ("CT") scan of Plaintiff's abdomen and pelvis conducted in

September 2003 was interpreted as a negative study showing no evidence of biliary ductal

dilatation, normal liver, spleen, pancreas, adrenal glands, and kidneys, and no evidence of

abdominal fluid collection. (TR 341).  In April 2003,  Plaintiff sought treatment for bilateral

hand pain.  She was evaluated by an orthopedic surgeon who recorded a preliminary diagnosis

of carpal tunnel syndrome but indicated he wanted to perform nerve conduction studies to

confirm the diagnosis. (TR 163). Plaintiff was prescribed anti-inflammatory medication and

advised to wear "night splints." (TR 163).  An x-ray of Plaintiff's right wrist at that time showed "small erosive change involving the ulna styloid process" and no joint space narrowing. (TR 162).  In June 2003, Plaintiff sought emergency room treatment for a severe sunburn, dehydration, and depression that she related to financial problems, the death of a friend, an elderly father who was ill, a husband who "doesn't work and [is] not looking," and "multiple life stressors." (TR 193, 204).  She stated she had stopped taking prescribed anti-depressant medication one week before. (TR 204).  Anti-depressant medication was restarted, Plaintiff's dehydration and lower extremity sunburn symptoms resolved, and Plaintiff was discharged two days later with a prescription for anti-depressant medication. (TR 205). Plaintiff was treated at an emergency room in September 2003 where she complained of tinnitus, dizziness, and nausea.  She was diagnosed with "labarynthitis" and prescribed medication for pain, nausea, and dizziness. (TR 214).  CT scans of her brain and temporal bones conducted at that time were negative. (TR 217, 218).  She was referred to an ear, nose, and throat specialist, Dr. Worrall, who stated in a letter to Dr. Hubbard dated October 1, 2003, that tuning fork testing showed Plaintiff had a high frequency hearing loss and that he wanted her to undergo pure tone audiometry testing. (TR 223).  Dr. Worrall noted he suspected her current hearing problems were related to a eustachian tube dysfunction aggravating her tinnitus. (TR 223).  A CT scan of Plaintiff's paranasal sinuses conducted in October 2003 showed "[m]ild compromise of both ostiomeatal units." (TR 225).

In November 2003, Plaintiff sought treatment at an orthopedic clinic for neck pain and stated her pain had worsened since joining a bowling team. (TR 230).  She stated that she had

recently been treated with pain medication prescribed by her family physician and that she was taking anti-anxiety medication which helped relieve muscle spasms. Plaintiff denied muscle weakness. (TR 230).  A physical examination reportedly showed fairly good range of motion, negative clinical signs, good asymmetrical strength, and good sensation.  (TR 230). Radiographic tests reportedly showed "advanced degenerative disease" of Plaintiff's neck at one level. (TR 230).  The impression was cervical radiculopathy for which anti-inflammatory and pain medications were prescribed, as well as physical therapy, and Plaintiff was advised to return in three weeks. (TR 230-231).  In a follow-up evaluation in December 2003, Plaintiff reported continuing neck and shoulder pain but felt the anti-inflammatory medication was helping.  The physical therapy and medications were continued. (TR 228).  A magnetic resonance imaging ("MRI") test of Plaintiff's cervical spine conducted in December 2003 was interpreted as showing posterior disc osteophytes at three levels causing moderate thecal sac effacement and narrowing of the neural foramina at one level. (TR 238).

In December 2003, Plaintiff sought treatment at a hospital emergency room for upper right quadrant pain. (TR 239).  She reported a past medical history of primary biliary cirrhosis, hepatitis C infection, and GERD. (TR 239).  Plaintiff was advised to continue her medications and follow up with Dr. Morris. (TR 2239-241).   In January 2004, Plaintiff underwent esophagogastroduodenoscopy and colonoscopy testing, which was normal except for internal hemorrhoids. (TR 255-259).  Plaintiff was hospitalized from January 31, 2004 to February 2, 2004 for treatment of an upper respiratory infection.  (TR 243).  Plaintiff provided a past medical history of hepatitis C infection "in remission" and "newly diagnosed" primary biliary

cirrhosis. (TR 244).  The discharge diagnoses were atypical upper respiratory infection with bronchitis, urinary incontinence, hepatitis C, and primary biliary cirrhosis. (TR 243).  Dr. Hubbard noted Plaintiff had progressively improved with medications. (TR 243).

In February 2004, Plaintiff underwent bone density testing, and Dr. Morris reported to Plaintiff that she had osteopenia, or some mild loss of bone density, that she should take a daily calcium supplement "to minimize your bone loss related to your primary biliary cirrhosis and maintain your bones in a healthy fashion over time." (TR 274).  In March 2004, Dr. Morris reported to Dr. Hubbard that Plaintiff was nearing completion of 48 weeks of hepatitis C medication therapy and that she showed a good response to treatment. (TR 272).  He reported she had "some mild fatigue" but otherwise had tolerated the treatment well without side effects. (TR 272).  Plaintiff was scheduled for a liver ultrasound due to her history of primary biliary cirrhosis. (TR 273).  In a consultative physical examination of Plaintiff conducted for the agency in March 2004, Dr. Williams reported that Plaintiff exhibited "mild or minor" restrictions of movement in her neck, normal neurological signs, normal grip strength, and no difficulty moving from a seated to standing position, normal station, posture, and gait, and no other abnormalities. (TR 265-267).

The record also contains office notes of treatment of Plaintiff by Dr. Hubbard between December 2001 and May 2004, although Dr. Hubbard's notations are largely illegible. (TR 305-376).  The reports of nonexamining agency reviewers with respect to the existence of a mental impairment (TR 291) and a physical residual functional capacity assessment for Plaintiff (TR 378) appear in the record.  Additionally, records of more recent medical

treatment of Plaintiff at medical clinics in August to October 2005 are included in the record. (TR 385-398).   Plaintiff was treated for an ear infection, asthma, and chronic pain with medications in August 2005. (TR 398).   In September 2005, Plaintiff was treated for a viral infection, headache, and cough with medication. (TR 392).   In October 2005, Plaintiff complained of neck pain with pain and tingling down her left arm.   (TR 390).   On examination, Plaintiff reportedly exhibited complete range of motion, equal strength in her upper and lower extremities, and no neurological deficits. (TR 390).   Plaintiff was prescribed medication for neck pain. (TR 390).   She complained to a different treating clinic in October 2005 of neck pain and radiating pain down to her left wrist due to cervical disease.   She was prescribed medication for muscle spasm and steroid medication for "cervical spine." (TR 398).   Lastly, the record contains the  report of MRI testing of Plaintiff's cervical spine conducted in August 2006. (TR 411).   As interpreted by the radiologist, the test showed the presence of "very minimal" or "mild" narrowing of the neuroforamina at two levels and "mild" or "mild to moderate" effacement of the subarachnoid space at three levels. (TR 411).

V. Step Two

At step two, the ALJ must determine "whether the claimant has a medically severe impairment or combination of impairments." Bowen v. Yuckert, 482 U.S. 137, 140-141 (1987).  This determination is governed by the agency's "severity regulation" at 20 C.F.R. § 404.1520(c) (2007).  Pursuant to this regulation, the claimant must make a "threshold showing that his medically determinable impairment or combination of impairments significantly limits his ability to do basic work activities." Williams v. Bowen, 844 F.2d 748, 750-751 (10th Cir.

1988).   Although the claimant must make only a "de minimis"showing that the medical

condition is medically severe, "the claimant must show more than the mere presence of a

condition or ailment." Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

Following the sequential evaluation procedure, the ALJ found at step two that Plaintiff

had severe impairments due to degenerative disc disease of the cervical spine and liver

disease. (TR 16).   Plaintiff argues that the ALJ erred by not finding the presence of a severe

impairment due to "cervical spine arthritis."   Plaintiff's Brief, at 2. It is unclear from

Plaintiff's argument how "cervical spine arthritis" differs from the severe impairment of

degenerative disc disease of the cervical spine found by the ALJ.   The ALJ found that

Plaintiff's cervical impairment was a pain-causing impairment which necessitated an

evaluation of her allegation of disabling pain and limitations caused by the cervical

impairment. (TR 18-19).   See Luna v. Bowen, 834 F.2d 161, 164 (10th Cir. 1987)("[I]f an

impairment is reasonably expected to produce *some* pain, allegations of *disabling* pain

emanating from that impairment are sufficiently consistent to require consideration of all

relevant evidence."). Thus, Plaintiff's assertion that "[a]rthritis is a painful disorder" presents

only a superfluous argument.  Indeed, the pages of the medical record relied on by Plaintiff

do not include any diagnosis of arthritis.  Rather, the record shows that Plaintiff's treating

orthopedic physician diagnosed Plaintiff in November 2003 with cervical degenerative disc

disease. (TR 233).   The consultative examiner, Dr. Williams, included in his report a

diagnostic assessment of cervical disc disease. (TR 267).  There is substantial evidence in the

medical record supporting the ALJ's finding of a severe impairment due to cervical

10

degenerative disc disease.  Accordingly, this claim of error is without merit.

Plaintiff next contends that the ALJ erred in failing to find the presence of a severe impairment due to Meniere's disease.[1]  Plaintiff points to numerous pages in the medical record as support for the assertion that "she had Meniere's disease with decreased hearing, dizziness or vertigo, and tinnitus, or ringing in the ears." Plaintiff's Brief, at 3.  The record, though, presents far fewer references to actual treatment of Plaintiff for any hearing-related or ear-related condition.  The record shows Plaintiff was treated on one occasion for "labarynthitis" in September 2003 at a hospital emergency room.  Medication was prescribed, and Plaintiff was advised to follow up with her primary care physician. (TR 214).  This treatment pre-dates the Plaintiff's alleged disability onset date.  A computed tomographic scan ("CT scan") of Plaintiff's brain and a CT scan of Plaintiff's temporal bones conducted at that time were normal. (TR 217, 218).  An ear, nose, and throat specialist, Dr. Worrall, provided a diagnostic impression on October 1, 2003, of "eustachian tube dysfunction aggravating her tinnitus."  (TR 223).  Dr. Worrall also noted that testing showed the existence of a high frequency hearing loss. (TR 223).  However, the physician stated he wanted to perform another diagnostic procedure, a pure tone audiometry test, and there is no record that Plaintiff returned to Dr. Worrall for further evaluation.  A CT scan of Plaintiff's paranasal sinuses conducted in October 2003 showed only "[m]ild compromise of both ostiomeatal units." (TR

---

[1]Meniere's disease has been described as "a condition that causes occasional episodes of vertigo and vomiting." Perkins v. St. Louis County Water Co., 160 F.3d 446, 448 (8th Cir. 1998).

225).

In November 2003, Plaintiff complained to Dr. Hubbard of headaches, visual problems, "both ears hurt when turning head or moving," and "ringing in head." (TR 332). Medications were prescribed by Dr. Hubbard for "vertigo." (TR 332). Although Dr. Hubbard's office notes are largely illegible, it appears that he could have prescribed medication in two office visits by Plaintiff in November 2003 for "Meniere" and migraine headaches. (TR 330, 331). Plaintiff reported in one of these office visits in November 2003 that her dizziness was improving and that the medication previously prescribed by Dr. Hubbard for this condition was "helping." (TR 330). In an office visit in December 2003, Plaintiff did not complain to Dr. Hubbard of dizziness, hearing-related, or ear-related symptoms. Dr. Hubbard prescribed medication to Plaintiff to treat an ear infection in January 2004. (TR 316). Dr. Hubbard's office notes show that he saw Plaintiff in February and March 2004 and that she did not complain of dizziness, hearing-related, or ear-related complaints. In April 2004, Plaintiff reportedly complained to Dr. Hubbard of dizziness as well as multiple other symptoms, including "sensitive" ears. (TR 307). It is difficult to decipher Dr. Hubbard's diagnostic impression in his office note of this visit, but the impression could include "Meniere." (TR 307). Medications were prescribed. Plaintiff was treated for an ear infection in August 2005. (TR 398). She was treated for a viral syndrome in September 2005. (TR 392).

Although the ALJ did not specifically refer to all of the foregoing evidence, Plaintiff has not shown that "significantly probative evidence" was ignored in the ALJ's determination. At her administrative hearing, Plaintiff did not describe any limitations related to Meniere's

disease, a hearing deficit, vertigo, or dizziness.  Because the medical evidence in the record did not indicate that the condition was of such severity, frequency, or duration to constitute a severe impairment within the meaning of the regulations, there is substantial evidence in the record supporting the ALJ's step two finding.  Moreover, because the record fails to show that Plaintiff persistently sought treatment for Meniere's disease or related symptoms and because Plaintiff did not testify that Meniere's disease or related symptoms limited her ability to work, the ALJ did not err in failing to consider the effect of Meniere's disease upon Plaintiff's RFC for work.

Plaintiff next contends that the ALJ erred in failing to find that she had a severe impairment due to depression and/or that depression symptoms restricted her ability to work. The ALJ rejected Plaintiff's assertion that depression was a severe impairment that prevented her from working either alone or in combination with her other impairments.  The ALJ expressed his reasoning for this finding in his decision:

> The claimant has been diagnosed with depression and prescribed anti-depressant medications by her treating physician.  She has not sought mental health treatment and has not been referred for such treatment .  The claimant testified that Paxil had helped her depression.  Following careful review of the record, the [ALJ] is persuaded that the claimant's depressive symptoms are mild and treatable, would have no more than a minimal affect [sic] on her ability to perform work-related activities, and is not a "severe" impairment by Social Security definition.  The claimant has the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

(TR 16-17).

In a disjointed argument, Plaintiff contends that the ALJ's findings with respect to the severity of Plaintiff's depression were "improper" and that the ALJ's findings with respect to Plaintiff's resulting functional limitations were conclusory and did not meet the requirements of Cruse v. U.S. Dep't of Health & Human Servs., 49 F.3d 614 (10th Cir .1995) and 20 C.F.R. § 404.1520a.  Plaintiff's Brief, at 3-4.   Plaintiff further contends that  the evidence showed marked functional limitations resulting from depression, and the ALJ erred in failing to consider the observations of a Social Security Administration clerk in determining her functional limitations stemming from depression.

The procedure established by the agency for evaluating mental impairments is set forth in 20 C.F.R. §§  404.1520a and 419.920a.  As described in Cruse, 49 F.3d at 617, "[t]his procedure first requires the [Commissioner] to determine the presence or absence of 'certain medical findings which have been found especially relevant to the ability to work,' sometimes referred to as the 'Part A' criteria...The [Commissioner] must then evaluate the degree of functional loss resulting from the impairment, using the 'Part B' criteria."

Although the ALJ discussed the relevant medical evidence in the record with respect to his "Part A" finding of a nonsevere mental impairment, the ALJ's decision does not relate the medical evidence to his conclusions with respect to his analysis of the degree of functional loss under the "Part B" criteria.  Even if this was error, it was harmless because no reasonable factfinder could have resolved this step-two issue in any other way.  See Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004).  Under "Part A," the ALJ found that there was not

sufficient evidence in the record to show a severe impairment due to depression.  The ALJ recognized that Plaintiff's treating physician had prescribed medications for depression. Although, as Plaintiff points out, treatment by a mental health specialist is not required to show a severe mental impairment, the ALJ recognized that Plaintiff had been treated for depression with medication and that Plaintiff's depression appeared to be controlled with medication.  The record shows Plaintiff was prescribed anti-depressant medication in June 2003 for depression that she expressly related to her personal financial situation, the death of a friend, and other "multiple stressors," according to Dr. Hubbard's discharge summary report. (TR 193).  In October 2003, Plaintiff's treating gastroenterologist stated that Plaintiff gave a history of "depression under good control" with anti-depressant medication. (TR 276).  In April 2004, Dr. Hubbard noted a diagnostic assessment of anxiety/depression following an office visit by Plaintiff, for which he prescribed anti-depressant medication. (TR 307).  The ALJ's findings with respect to the severity of Plaintiff's depression and resulting functional limitations are supported by the report of state agency consultative reviewer who found that Plaintiff's affective disorder was not a severe impairment and that Plaintiff exhibited only mild functional limitations in her activities of daily living and social functioning as a result of depression symptoms. (TR 291-303).

Plaintiff contends that there is evidence in the record showing her activities of daily living, social functioning, and concentration, persistence, or pace are "markedly impaired" and that her "'melt down' at work that resulted in her being fired represented a decompensation." Plaintiff's Brief, at 6.  Plaintiff testified that she lost her job in November 2003 when she "got

into it with a patient," that she had memory loss she attributed to primary biliary cirrhosis, and that she cooked for her family, washed dishes, drove about 50 miles a week, got her children up for school in the mornings, ran errands for her mother two or three times a week, liked to read, and shopped at discount and grocery stores. Plaintiff did not relate any limitations in her daily activities, social functioning, concentration, persistence, or pace, or her November 2003 job termination to depression.

Plaintiff points to the observations of a Social Security Administration ("SSA") clerk who completed a disability report with respect to Plaintiff's applications for benefits. (TR 113-115). In this report, the clerk noted her observation that during an interview with Plaintiff she "was well-groomed and rather friendly.  She did seem somewhat reserved and was slow to resond [sic] to a few of the questions that I asked her." (TR 114).  On the report, the clerk noted that Plaintiff had difficulty with coherency and concentration during the interview. (TR 114).  Of course, any number of reasons not related to Plaintiff's alleged mental impairment could have caused the coherency and concentration deficits noted by the SSA clerk.  Thus, the report did not provide significantly probative evidence of a mental impairment that the ALJ was required to discuss in the decision.

Plaintiff relies on an opinion issued by the District Court of Kansas, <u>Smith v. Astrue</u>, 2007 WL 1223900 (D. Kan. Apr. 9, 2007), in which the court discussed Social Security Ruling 96-7p, 1996 WL 374186, at * 8, and stated that "[w]hen evaluating the credibility of the individual's statements, the adjudicator must also consider any observations recorded by SSA personnel who previously interviewed the individual....The failure of the ALJ to consider

the statement of an SSA employee requires remand in order for the ALJ to take the statement into consideration." Id., at * 6 (citing Blea v. Barnhart, 466 F.3d 903, 915 (10th Cir. 2006)). Plaintiff contends that pursuant to Smith and SSR 96-7p, the ALJ's failure to express his consideration of the SSA clerk's observations warrants a remand. Smith is inapposite, however, because, unlike the situation in Smith, the SSA clerk's observations did not provide significantly probative evidence that corroborated Plaintiff's assertion of memory loss. Additionally, Plaintiff mischaracterizes the ALJ's decision. The ALJ did not "acknowledge [ ] that [Plaintiff] had a 'melt down' on the job, had a bad memory and lost things." Plaintiff's Brief, at 6. Rather, the ALJ summarized Plaintiff's testimony at her administrative hearing that she "last worked on November 3, 2003, and had a 'melt down' from stress on the job. She said her memory was bad and she misses appointments and loses things." (TR 18). Plaintiff's attorney is cautioned that such a gross mischaracterization is not acceptable briefing.[2]

At step two, "the claimant must show more than the mere presence of a condition or ailment." Hinkle, 132 F.3d at 1352. Substantial evidence in the record supports the ALJ's conclusions with respect to the existence of severe impairments, and no error occurred in this regard. Moreover, in light of Plaintiff's testimony that anti-depressant medication helped her depression and the scant objective evidence of treatment for depression, there is substantial

---

[2]Additionally, many of Plaintiff's attorney's statements concerning evidentiary documents in the record are not accurate characterizations of the documents themselves. Plaintiff's attorney should pay careful attention to the accuracy with which he  portrays documentary evidence in the medical record in presenting arguments in this Court.

evidence to support the ALJ's finding that depression did not restrict Plaintiff's RFC for work.

Plaintiff next contends that the ALJ erred at step two in failing to find that she had a severe impairment due to carpal tunnel syndrome and ignored evidence to support the existence of this impairment. The ALJ recognized in his decision that Plaintiff "was referred to Robert P. Shackelford, M.D., for evaluation of bilateral hand pain on April 14, 2003." (TR 17). The ALJ accurately summarized the objective clinical findings presented in Dr. Shackelford's report of his examination of Plaintiff on that date. (TR 17, 163). The ALJ also recognized Dr. Shackelford's preliminary diagnostic assessment was carpal tunnel syndrome. (TR 163). Plaintiff submits that the ALJ erred by failing to consider the results of an x-ray of Plaintiff's right wrist conducted a week before Dr. Shackelford's examination. The radiologist who conducted this x-ray on April 8, 2003, interpreted the x-ray as showing "[s]mall erosive change involving the ulna styloid process" but no fracture, dislocation, or joint space narrowing. (TR 162). This x-ray did not provide significantly probative evidence that should have been discussed by the ALJ in light of the remainder of the record. Dr. Shackelford noted that he prescribed anti-inflammatory medication and "night splints" to relieve Plaintiff's swelling and symptoms and recommended that she obtain nerve conduction velocity testing "to confirm the diagnosis." (TR 163). There is no additional evidence in the record of medical treatment of Plaintiff for carpal tunnel syndrome, and there is no evidence that Plaintiff underwent the recommended nerve conduction velocity tests. Plaintiff testified that she wore a brace on her left wrist because of cervical degenerative disc disease, and she did not describe any limitations in her activities resulting from carpal tunnel syndrome. There

18

is substantial evidence in the record to support the ALJ's step two finding of severe impairments, and no error occurred in this regard.

VI. <u>Step Four</u>

Plaintiff contends that the ALJ erred at step four[3] in determining the credibility of her allegation of disabling pain and fatigue by relying on Plaintiff's testimony concerning her daily activities.  Plaintiff contends that the ALJ (1) failed to consider that the performance of household chores does not indicate an ability to perform substantial gainful activity, (2) ignored evidence that Plaintiff's daughter and husband helped her with household chores, (3) did not demonstrate that Plaintiff performed these activities more than sporadically, and (4) miscast the evidence of her church attendance.

Further, Plaintiff asserts that the Commissioner's decision must be remanded because the ALJ exhibited bias against Plaintiff at the administrative hearing, because the ALJ failed to set forth which of Plaintiff's statements at her hearing were accepted and which were rejected, and because the ALJ resorted to boilerplate findings to support his credibility determination.

At step four, the claimant bears the burden of proving an inability to perform the duties of the claimant's past relevant work. <u>See</u> <u>Andrade v. Secretary of Health & Human Servs.</u>, 985 F.2d 1045, 1051 (10th Cir. 1993).  At this step, the ALJ must "make findings regarding 1) the

---

[3]Plaintiff apparently inadvertently refers to "step 3" in this portion of her brief, Plaintiff's Brief, at 4, 6, because the Plaintiff refers only to the ALJ's discussion of his step four RFC finding and concomitant credibility determination. (TR 17-19).

individual's [RFC], 2) the physical and mental demands of prior jobs or occupations, and 3) the ability of the individual to return to the past occupation, given his or her [RFC]." Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 361 (10th Cir. 1993).  The assessment of a claimant's RFC necessarily requires a determination by the ALJ of the credibility of the claimant's subjective statements. "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)(footnote omitted).

The ALJ summarized the medical and nonmedical evidence in assessing the credibility of Plaintiff's allegation of disabling pain and other nonexertional symptoms, including fatigue, caused by her cervical degenerative disc disease and liver disease.  To support his finding that Plaintiff's assertions of disabling nonexertional symptoms were not entirely credible and that Plaintiff was capable of performing light work, the ALJ pointed to specific objective medical evidence, including the report of the consultative physical examiner, Dr. Williams, and other medical evidence showing that Plaintiff exhibited only "mild or minor" restrictions in neck range of motion in March 2004, had not been diagnosed with ascites (described as "an accumulation of clear body fluid in the abdominal cavity" in Henderson ex rel. Henderson v. Apfel, 179 F.3d 507, 511 (7th Cir. 1999)), and that she had not exhibited neurological or motor deficits during physical examinations.  Further, the ALJ reasoned that Plaintiff's "treating

physicians did not place any functional restrictions on her activities that would preclude light work activity." (TR 19).  Plaintiff complains that the ALJ did not discuss all of the evidence, "merely picking and choosing the portions of the reports that suited him and supported his determination of nondisability, while ignoring the portions favorable to Claimant." Plaintiff's Brief, at 8.  This is not the standard applicable to the ALJ's decisionmaking, however.  The ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton, 79 F.3d at 1010.   The ALJ's decision reflects consideration of the consultative examiner's report with respect to the cervical range of movement exhibited by Plaintiff at this examination. (TR 18, 267). As the ALJ reasoned, Dr. Williams found Plaintiff exhibited only "[m]ild or minor restrictions of motion ... in the neck." (TR 267).  Plaintiff's reference to specific findings in the consultative examiner's report does not show a conflict with Dr. Williams' assessment of Plaintiff's range of cervical motion. Plaintiff's reference to other isolated instances in the record in which Plaintiff exhibited "pain with palpation along the cervical spine" and "tenderness in the medial aspect of the shoulders" on one occasion in October 2005 (TR 390-391) and "muscle spasm" on one occasion in October 2005 (TR 398) also fails to present a conflict in the evidence concerning the severity of Plaintiff's impairment due to cervical degenerative disc disease. Plaintiff's assertion that the ALJ "ignored" an abdominal scan demonstrat[ing] free fluid in her abdominal cavity" is frivolous. Plaintiff's Brief, at 8.  Plaintiff did not provide any evidence of medical treatment for ascites or provide evidence that such a condition, if it existed, would restrict her ability to

work in any manner.  No error occurred with respect to the ALJ's consideration of the objective medical evidence in assessing Plaintiff's RFC for work and the credibility of her allegations of disabling pain and other nonexertional impairments.

The ALJ also referred to Plaintiff's statements during her administrative hearing concerning her daily activities.  Although Plaintiff chides the ALJ for relying on these daily activities and for stating that Plaintiff "attends church" where she only testified that she belonged to a church, Plaintiff testified to a wide range of activities that were properly considered by the ALJ in assessing the credibility of her assertion of disabling pain and other nonexertional symptoms caused by her severe impairments.  20 C.F.R. §§ 404.1529(a), 416.929(a).  Plaintiff did not show that she performed these activities only sporadically.

 Plaintiff contends that the ALJ's decision ignores her chronic complaints of fatigue and her testimony that she needed "naps during the day" which would require accommodations from an employer.  Plaintiff testified that she "[t]ake[s] a nap every day or lie[s] down" and that she does not always sleep during the day. (TR 434). The ALJ's decision reflects consideration of Plaintiff's fatigue complaint, and Plaintiff testified to a wide range of activities that were not inconsistent with and supported the ALJ's finding of an RFC for light work.[4]  No error occurred in this regard.

In Plaintiff's Brief, Plaintiff conjectures that she "is at least confined to sedentary work

---

[4]Light work is defined in the regulations as work involving mostly sitting and standing or sitting with pushing or pulling of arm or leg controls and lifting up to 10 pounds frequently and 20 pounds occasionally. 20 C.F.R. § § 404.1567(b), 416.967(b).

by her doctor." Plaintiff's Brief, at 10.  No physician has restricted Plaintiff's work-related activities.   The only limitation placed on Plaintiff by a physician was a suggestion in November 2003 to "stop bowling" after she sought treatment for neck pain. (TR 230).

Plaintiff contends that the ALJ was biased against her because of a statement made by the ALJ during the administrative hearing.  During Plaintiff's testimony, her attorney asked Plaintiff whether she had been advised she had signs of osteoporosis, and Plaintiff testified that she had been diagnosed with osteopenia, or a weakening of the bones. (TR 430). Plaintiff's attorney then asked Plaintiff whether she had a "large abdomen from fluid accumulation," and she advised that she did not know if her abdomen was large because of "fluid." (TR 430).  Plaintiff's attorney asked her to stand, and the attorney stated that "[t]hat has come about since I have know her in the last year." (TR 430).  At this point, the ALJ stated, "You realize that none of these are disabling." (TR 430).  Plaintiff's attorney responded that he believed "a specialist" could ascertain whether these conditions were disabling. (TR 431).   Plaintiff also suggests that the ALJ "argued" with Plaintiff and her representative at other points during the hearing.  Upon consideration of the entire record of the hearing, Plaintiff's allegation of bias by the ALJ is not supported by the record.  Although the ALJ's questioning was pointed and his statements to Plaintiff and Plaintiff's counsel indicated an attempt to direct the focus the hearing on the ultimate issue of disability, the ALJ provided Plaintiff a full opportunity to develop the record and present medical evidence at and after the hearing.  Thus, the allegation of bias does not warrant a remand. Puckett v. Chater, 100 F.3d 730, 734 (10th Cir. 1996)(where record showed plaintiff received full opportunity to develop

23

record and present evidence plaintiff's conclusory allegation of bias by ALJ was not prejudicial). Moreover, Plaintiff's suggestion that the ALJ should have ordered a consultative examination is frivolous. The record contains the report of a physical examination of Plaintiff by a consultative examiner, and the medical record was more than adequate to provide the evidence necessary for administrative decisionmaking. See Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997)("The duty to develop the record is limited to fully and fairly developing the record as to material issued."); Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 778 (10th Cir. 1990)(recognizing Commissioner's broad discretion in ordering consultative examinations).

The ALJ found that Plaintiff retained the capacity to perform light work. Relying on the VE's testimony with respect to the exertional requirements of Plaintiff's previous jobs, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act because she retained the capacity to perform her previous jobs as a data entry operator and switchboard operator. There is substantial evidence in the record to support this finding. The VE testified that Plaintiff's prior job as a PBX, or switchboard, operator was sedentary work as classified by the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") and light work as she described the job. (TR 441). The VE testified that Plaintiff's previous job as a data entry operator was sedentary work both as classified by the DOT and as the job was performed by Plaintiff. (TR 441-442). Plaintiff did not meet her burden of providing evidence that she was not capable of performing her past relevant work, and therefore the Commissioner's decision should be affirmed.

<u>RECOMMENDATION</u>

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits.  The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before ____October 15th____, 2007, in accordance with 28 U.S.C. § 636 and LCvR 72.1.  The parties are further advised that failure to file a timely objection to this Report and Recommendation waives their respective right to appellate review of both factual and legal issues contained herein. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ____25th_____ day of ____September_____, 2007.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE